# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

October 9, 2024

**VIA ECF**
Honorable Jennifer L. Rochon
United States District Judge
500 Pearl Street
New York, NY 10007

Re:   **United States v. Christen Chen**
      24-cr-**077 (JLR)**

Dear Judge Rochon,

Christen Chen is a 29-year-old nonviolent person who has accepted responsibility for his role in a scheme to deal firearms without a license. Under extreme financial pressure and in an ill-conceived effort to make money, he agreed to help sell guns acquired in Georgia and North Carolina in New York City. Christen is deeply ashamed of his conduct; he understands that, though Georgia and North Carolina (both states where he has lived) embrace tolerant cultures around guns, his actions stood to exacerbate the scourge of gun violence in New York. Worse, his actions have caused him and his family tremendous pain and only furthered the financial strain on them he sought to alleviate.

But Christen's life and background illustrate that he is so much more than this terrible mistake of judgement. Despite being born into a life of poverty, and enduring abuse, violence, health issues, and housing insecurity, Christen has strived to be a responsible and supportive son, partner, and father. Moreover, his actions in this case have already come at tremendous cost: in addition to being detained in the horrific conditions of MDC Brooklyn since January 2024, Christen's detention caused him to miss the birth of his second child. This case reflects the first time Christen has been a father separated from his children by incarceration, a devastating reality that has made Christen resolved to never offend again.

The parties have stipulated that Christen's sentencing Guideline range is 108-120 months of incarceration, and Probation concludes that his advisory Guideline range is 120 months. However, for the reasons set forth below, these figures overstate both Christen's criminal history and his offense conduct. Accordingly, while we agree with Probation that a downward variance is appropriate, for the reasons set forth below, the factors under 18 USC § 3553(a) demand a substantially greater variance than the one Probation proposes. Given Christen's history and

characteristics, his relatively minimal criminal history (overstated in the Guidelines), his culpability relative to his co-defendant, the punishment he has already served to date, and his proactive work toward a reentry plan, a sentence of 36 months is sufficient but not greater than necessary to achieve the goals of sentencing.[1]

## I.    **BACKGROUND**

### A. *Christen's Impoverished & Abuse-Filled Childhood in Brooklyn*

Christen Chen was born into poverty in 1995 in the Bronx. His mother, Christine was still a teenager when she had him. Christine had a total of four children with Christen father, though their third child – Christen's younger brother CJ – died at birth, a source of grief that overshadowed his childhood. Christen's parents were never together during his lifetime. His father was incarcerated shortly after Christen was born, and released when Christen was around seven, only to be reincarcerated again shortly thereafter for another lengthy period. Christen did not have a relationship with his father until Christen was a teenager.

Christen was raised by his mother, Christine, who worked multiple minimum wage jobs but nevertheless depended on government assistance to keep the family afloat. Thanks to food stamps and a Section 8 voucher, Christen and his siblings' most basic needs of food and shelter were met. But beyond those, the family had no money; the electricity in their home was routinely shut off. PSR ¶75. Christen was just a child when he learned that selling things that were illegal – such as drugs – was an easy way to make "fast" money. Id. Indeed, when Christen was growing up, his mom sold marijuana to supplement the family's income. Starting at the age of seven, Christen would help his mother sell. The family used the money to pay bills and buy basic necessities, like clothes.

Beyond poverty, Christen experienced, and was exposed to, violence as a child. Both his mother, and his maternal grandmother, who he lived with for several years in Brooklyn, were harsh disciplinarians who routinely beat Christen with clothes hangers and other objects.[2]

---

[1] We ask to strike paragraph 7(c)(iii) from the Presentence Report, which reflects language in the plea agreement that the parties have since agreed to amended. We further ask that the Court replace that language with the following line, to reflect the parties' amended agreement: "The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a)."

[2] Like many people who grew up with corporal punishment, Christen resists calling it "abuse," and defends his caregivers by citing their West Indian background. But contrary to so-called "debates" around corporal punishment, research *overwhelmingly* shows that harsh physical discipline, even that considered "justified" by caretakers,

Worse than the beatings his mother and grandmother gave him, Christine's boyfriends were also abusive toward Christen. For a while, Christine was in a romantic relationship with a man Christen remembers as "Sean," who is the father of Christen's younger brother, Cyncere. Christen vividly recalls an incident when he was only eight years old, when Sean got angry at Christen and started choking him, forcing Christen to physically defend himself. Christine's subsequent long-term partner, Kelly Thorbourne, also physically and emotionally abused Christen. His mother and Thorbourne were exceptionally demeaning to Christen. PSR ¶77. To this date, Christen does not understand why they mistreated him, but he believes it's because he was the only surviving son of his father and he reminded them of his father.

Violence was normalized for Christen in other ways. Christen spent several years of his childhood in Flatbush, Brooklyn. As his mother worked nights and was not around to watch the kids, Christen was often out on the streets alone after dark. He vividly remembers, at the age of eight, seeing a man from his neighborhood slash open another man, and at the age of ten, being with a group of people when they were shot at. Such violence made Christen acutely aware of the dangers of gun violence; but perhaps unsurprisingly, it caused him to think of guns as a source of protection from violence as well.

As a teenager, Christen developed painful bone disease in his left shin.[3] The disease required surgery that resulted in rods and pins being left in his leg. Following surgery, Christen spent seven months in a wheelchair and had to learn to walk again. Christen still suffers pain because of this surgery. Later in life, he turned to substances – particularly marijuana, ecstasy, and pills, to help numb this pain. Christen's lack of access to proper health care and pain management, as well

---

harms children, and is linked to negative outcomes such as poor mental health, lower cognitive ability, lower self-esteem, aggression, and antisocial behavior. See, e.g., Elizabeth T. Gershoff et. al., *The strength of causal evidence against physical punishment of children and its implications for parents, psychologists, and policymakers*, 73(5) AMERICAN PSYCHOLOGIST 626–638 (Jul. 2018) https://doi.org/10.1037%2Famp0000327; Liane Peña Alampay et. al., *Severity and justness do not moderate the relation between corporal punishment and negative child outcomes: A multicultural and longitudinal study*, 41(4) INTERNATIONAL JOURNAL OF BEHAVIORAL DEVELOPMENT 491–502 (Jun. 2017) https://doi.org/10.1177/0165025417697852.

[3] Though Christen does not recall the exact type of bone disease he had, it is worth noting that bone disease in children and adolescents is often associated with malnutrition, notably a lack of dietary minerals and vitamin D. See Steven A. Abrams, Bone Health in School Age Children: Effects of Nutritional Intake on Outcomes, Frontiers in Nutrition (Nov. 19, 2021) https://doi.org/10.3389%2Ffnut.2021.773425; Heather A. Eicher-Miller et al., *Food Insecurity Is Associated with Diet and Bone Mass Disparities in Early Adolescent Males but Not Females in the United States*, 141 Journal of Nutrition 1738-1745 (Sep. 2011) https://doi.org/10.3945/jn.111.142059.

as his lack of access to substance abuse treatment, has contributed to his substance abuse, which exacerbated the poor judgement that led to the instant offense.

B. *Housing Instability & Criminal Justice Involvement in Georgia*

When Christen was 16 years old, his mother relocated the family to Georgia, in search of a cheaper costs of living. Christen enrolled in high school and tried to adapt to his new surroundings. However, he continued to have a tense relationship with his mother's boyfriend, Kelly Thorbourne, who was persistently verbally abusive to him. Christen's mom took Thorbourne's side in this conflict, and eventually kicked Christen out.

Christen had no money and nowhere to live. He dropped out of high school and went to North Carolina for the summer to live with his father, who by now was home from prison and who put him to work moving furniture. Christen returned to Georgia with enough money saved up to get his own place. But that fall, when he had just turned 19, he was arrested for driving a car that had been reported stolen, resulting in a significant fine and a sentence of probation that required him to pay fees for his own supervision. Christen was unable to keep up with the costs of rent and probation, and soon lost his apartment. In search of work, he kept returning to North Carolina, where his father could often help him secure temporary work as a truck driver and mover. He also briefly moved with a girlfriend to Ohio, where he found temporary work in warehouses.

But none of these jobs provided enough income for a stable residence. In September 2017, two days after his 22nd birthday, while Christen was in North Carolina working with his dad, he was arrested on a probation warrant out of Georgia. PSR ¶67. He was returned to Georgia and sentenced to two years of jail. PSR ¶59. When he was released, he was immediately arrested again for driving without a valid license. PSR ¶60. He was sentenced to another fine and period of probation, which he also couldn't pay, resulting in yet another period of incarceration. Id.

### C. Partnership & Fatherhood

During his time in North Carolina, Christen met Kayla Mitchell, who he dated on and off for the next decade. Kayla joined Christen in Georgia when he was released from his first probation violation. Lacking stable housing; they bounced around hotels and lived out of their car for seven months, before eventually moving into a series of friends' apartments. Both Christen and Kayla worked minimum wage jobs during this time to survive – him on a recycling truck, her at a Waffle House – but could never make enough money to satisfy the upfront payment landlords required to get their own apartment. Adding to their financial strain, in 2022 Kayla became pregnant, and in December of that year, Christen and Kayla welcomed their son



Though Christen and Kayla remain strong friends and co-parents, Christen is candid that he did not remain fully faithful to Kayla during this period. In 2020, while visiting friends in New York, Christen reconnected with an old friend, Niesha Harris-Simoes, who lives in Staten Island. Christen began visiting Niesha regularly and found seasonal work in New York putting up tents for events. The work paid significantly better than what he could find in the South and allowed him to send money back to Kayla, who had returned with                her native North Carolina. It also allowed him to provide financial support to his mother and sister, who were struggling with homelessness.

Niesha already had a son, named              from a previous relationship, who Christen began to help raise like a stepson. In 2023, Niesha became pregnant with

Christen's child.  Christen was excited to become a father again, attending Niesha's obstetric appointments and ultrasounds whenever he could.  But Niesha's pregnancy added to his sense of financial pressure, as he was already straining to support himself and the many members of his family who were struggling.

### D. Offense Conduct

In 2023, Christen was primarily staying Staten Island with Niesha and and working installing event tents.  He traveled regularly to North Carolina to see Kayla,          and his father, and to Georgia to see his mother and siblings.  In addition to supporting Kayla,        , and        n, and preparing for the birth of his second son, Christen was also financially assisting his mother, Christine, who lives out of hotels in Georgia, as well as his sister, Cierra, who currently lives in a homeless shelter in Brooklyn.

In September 2023, Shaqoya Hall, a friend Christen knew from high school in Georgia, contacted Christen and asked for help selling guns.  She knew the guns she had in Georgia would fetch a good price in New York and offered to give Christen a cut of the proceeds.  Eager to earn extra money, Christen agreed. He asked a friend, Zachary Hampton, if he knew anyone who was in the market for guns. Hampton said his cousin would be interested in buying all the guns and connected him with Christen.  That cousin ended up being a confidential informant. Once Christen had identified a buyer, Shaqoya traveled from Georgia to New York to deliver the guns.  Christen partook in two sales to the informant.  After those sales, the informant continued to ask him for guns, and Christen shared more photos of guns he thought he could obtain in North Carolina and Georgia.

Christen profoundly regrets getting involved in gun dealing. Christen understands that there is an epidemic of gun violence in New York City, and that guns brought from the South are contributing to it.  He reflects that his time in Georgia and North Carolina clouded his judgement around guns because those states have such a permissive and proud culture of gun ownership.

Christen was arrested in January 2024.  He has been detained at MDC ever since. In May, Niesha gave birth to their son            baby Christen saw on ultrasounds but has scarcely been able to meet or hold.  Impressively, though Kayla and Niesha did not initially know each other, Christen's arrest has brought them together.  Following Christen's arrest and detention, Kayla relocated to New York and moved in with Niesha on Staten Island, so she and          could be close to Christen, and so          could be close to his soon-to-be-born baby brother, and stepbrother,        .  By living together, Kayla and Niesha have been able to ensure all three boys have the support and stability of two loving parents in their home while Christen serves his sentence.  For the first few months of his incarceration, Niesha and Kayla diligently brought the boys and, upon his arrival, the newborn baby, to visit Christen at MDC Brooklyn.  However, as the Court may

be aware, MDC Brooklyn recently changed its policy to disallow anyone other than immediate family visitation.  As Christen is not married to either Kayla or Niesha, they have been unable to visit Christen since July, and – other than on the day he entered his guilty plea – he has not been able to see his children since then.

### E. Conditions at MDC Brooklyn

As this Court is likely aware, the conditions at MDC are appalling.  During his time at MDC, Christen has endured constant lockdowns, missed and spoiled meals, inability to contact his family, and limited programming and work opportunities, in addition to the overall fear and stress of being incarcerated in a facility that has, in recent months, experienced two homicides.[4] Earlier this year, Judge Furman concluded that the excessive lockdowns, egregious lack of medical care, and physical conditions of confinement constituted "exceptional reasons" for keeping a defendant subject to mandatory remand out of custody. See *United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233 (S.D.N.Y. Jan. 4, 2024).

Likewise, in April, Judge DeArcy Hall of the Eastern District cited the conditions at MDC as part of her consideration in imposing a non-custodial sentence upon a defendant whose recommended guideline range was 37-46 months:

> I just have to state for the record that in fashioning an appropriate incarceratory sentence here would have proven difficult given the conditions that persist at MDC. The Court would likely have imposed a sentence which would have made it possible that the entire period of incarceration would have been served at MDC and that would have given me great pause. **I need to say this on the record as often as possible until the Government does what it needs to do to ensure that the conditions at MDC change. It is affecting the way in which judges are imposing sentences. It is, in some cases, requiring us, demanding that we sentence people for less time in jail than we otherwise would because the Government has failed to ensure that the conditions at MDC are improved and are improved at a level commensurate with what I believe is this great nation.**

---

[4] See Lola Fadulu, *Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail*, NY TIMES (Jul. 17, 2024) https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html; Courtney Gross, *Exclusive: Inmates decry conditions inside Brooklyn jail*, SPECTRUM NEWS (Jun. 24, 2024) https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions

<u>United States v. Bayron Garcia</u>, 23-cr-56 (LDH) (E.D.N.Y. Apr. 10, 2024) Tr. 22:14-23:7 (Transcript attached as **Exhibit G**).

Likewise, in August, the Honorable Judge Gary R. Brown of the Eastern District wrote about the "dangerous, barbaric conditions" at MDC Brooklyn. <u>United States v. Colucci</u>, 23-cr-417 (GRB), 2024 WL 3643857, at *1 (E.D.N.Y Aug. 5, 2024). In <u>Colucci</u>, Judge Brown sentenced a defendant with a recommended guideline sentence of 18-24 months to 9 months' incarceration,[5] citing the "[c]haos" and "uncontrolled violence" of MDC. <u>Id</u>. at *4. He detailed the conditions at MDC, nothing that much of this year – all the time Christen has been at MDC – "was marred by instances of catastrophic violence," including two homicides, two stabbings, and an assault so severe it resulted in a fractured eye socket for the victim. <u>Id</u>. "Taken together," Judge Brown concludes, "these incidents demonstrate a woeful lack of supervision over the facility, a breakdown of order and an environment of lawlessness within its confines that constitute unacceptable, reprehensible and deadly mismanagement." <u>Id</u>. at *6.

Judge Brown finds, as many other judges in this District and the Eastern District have, that the conditions at MDC "bear heavily on the [sentencing] determination by the Court," <u>id</u>., and that time spent at MDC is "materially different and necessarily disparate" from equivalent time at an "appropriately managed" facility. <u>Id</u>. at *7.

## **THE APPROPRIATE SENTENCE IS 36 MONTHS**

"In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." <u>United States v. Singh</u>, 877 F.3d 107, 121 (2d Cir. 2017) (cleaned up).

Christen has already sent nine months in horrific conditions of MDC, during which he has been separated from Kayla, Niesha, and their children, and missed the birth of his son. As such, he has already been harshly punished for his conduct in this case. Moreover, in light of Christen's own history, conduct, and culpability relative to others, the sentencing factors weigh in favor of a significant downward variance from the Guideline range. For the reasons set forth below, a sentence of 36 months of incarceration is "sufficient, but not greater than necessary," to comply with the mandate of 18 U.S.C. § 3553(a).

---

[5] Judge Brown further ordered that if the defendant was designated to MDC to serve his sentence, the term of imprisonment would be vacated and replaced with nine months of home incarceration. *Id*. at *7.

**a.** *The Guideline Range Overstates Christen's Criminal History & Offense Conduct*

Though the advisory Guideline range may serve as a "starting point" in fashioning an appropriate sentence, a sentencing court may not presume them reasonable under 18 U.S.C. § 3553(a).  See Gall v. United States, 552 U.S. 38, 50 (2007); United States v. Young, 811 F.3d 592, 599 (2d Cir. 2016).  Here in particular, the Court should give the Christen's advisory Guidelines range even less weight, as both Christen's criminal history category and offense level are inflated.

**i.** *The Guidelines Inflate Christen's Criminal History*

As described above and by Probation, Christen's prior convictions are all in Georgia, and his prior experience with incarceration has been entirely due to Georgia probation violations:

- In October 2014, when Christen was 19 years old, he was convicted of receiving a vehicle. PSR ¶59. He was originally sentenced to two years of probation and a $750 fine, a sentence that would have resulted in a single criminal history point.  However, following a positive marijuana test, Christen was sentenced to 30 days of incarceration.  PSR ¶59.  After his release, he was ordered to attend substance abuse treatment, which he would have to pay for. He could not afford it. He also could not afford to pay his fine, or the related fees or supervision Probation assessed him.  As a result, Georgia issued a warrant for him and ultimately resentenced him to two years of jail.  This sentence results in Probation assessing him three criminal history points.[6]

- In April 2019, when Christen was 23 years old, he was arrested for driving without a valid license in Georgia.  He pled no contest and was sentenced to a year of probation and an $860 fine.  Here again, Christen could not afford to pay the fine or the cost of probation. Probation issued a violation and sentenced him to four months in jail, though notably, they released him after only 13 days because he able to come up with $300 to pay probation.  PSR ¶60.  This sentence results in Probation assessing him two criminal history points.

These two violations of probation, which account for four of the five criminal history points Probation assesses to Christen, must be understood in the context of Georgia's draconian and predatory system of fines, fees, and "pay for" probation, which has been the subject of much documentation and litigation.

---

[6] Christen's plea agreement with the government assesses only one point for this conviction, rather than three, because the parties missed the fact that Christen was resentenced to two years of incarceration.

Indeed, in 2016, Georgia had more people on felony probation than any other state in the nation.[7]  The American Civil Liberties Union ("ACLU") has documented:

> [P]eople convicted of felonies spend, on average, over six years on probation in Georgia. The lengthy supervision terms contribute to high rates of recidivism, given the risk of a simple mistake during this time, like a failed drug test, new offense, or the inability to pay fees and fines that are a condition of probation. A Pew study found that probation revocations accounted for 55 percent of all prison admissions in Georgia.[8]

The problem also extends to misdemeanors, including low-level traffic infractions like the unlicensed driving offense for which Christen was arrested in 2019.  Georgia leads the nation with 40 percent of probationers on probation for misdemeanor or traffic offenses.[9]  And largely because Georgia has one of the worst public transit systems in the country, 75 percent of individuals in Georgia whose driver's licenses are suspended continue to drive.[10]  Likewise, Georgian municipalities disproportionally rely on collecting criminal fines and fees, a system that has been condemned for preying on poor people and exacerbating racial inequalities.  The Georgia Budget & Policy Institute explained as such:

> Simply put, the constructs of Georgia's fines and fees system are racist. They maintain a spiraling prison of debt that often traps Georgia's most economically vulnerable individuals and families, which fall along the fault lines of race and ethnicity, and exacerbate historic inequities across those same lines.[11]

The Court should disregard Christen's violations of probation, which are clearly a result of poverty and not a willful disregard for the "opportunity" for community supervision. PSR at 35. Notably, with respect to his April 2019 arrest for unlicensed driving, but for his violation of probation, this conviction would not even be eligible for *any* criminal history points. See U.S.S.G § 4A1.2(c)(1).  Thus absent the violations of probation, Christen would be assessed only one criminal

---

[7] Andrea Young, *How Georgia's Probation System Squeezes the Poor and Feeds Mass Incarceration,* ACLU (Nov. 13, 2018) https://www.aclu.org/news/criminal-law-reform/how-georgias-probation-system-squeezes-the-poor-and-feeds-mass-incarceration

[8] Id.

[9] Ray Khalfani, *Unjust Revenue from an Imbalanced Criminal Legal System: How Georgia's Fines and Fees Worsen Racial Inequity*, Georgia Budget & Policy Institute (Dec. 16, 2021) https://gbpi.org/unjust-revenue-from-an-imbalanced-criminal-legal-system/

[10] Id.

[11] Id.

history point – for the arrest in a stolen vehicle when he was 19 years old – and
would thus be in Criminal History Category I.

### ii. Christen's Offense Level Overstates His Offense Conduct

Christen's offense level is also inflated. First, Christen's offense level includes
a two-point enhancement because one of the guns he sold to the informant was
allegedly stolen. <u>See</u> U.S.S.G. § 2K2.l (b)(4)(A).  However, as Judge Weinstein in the
Eastern District found, this enhancement is largely unjustifiable, as it requires no
showing that the defendant actually *knew* the gun was stolen. <u>See</u> <u>United States v.
Handy</u>. 570 F.Supp.2d 437, 478-480 (E.D.N.Y. 2008) ("Research [shows] that
firearm retailers often sell guns to ineligible persons [e.g., convicted felons, non-
state residents] and report those guns lost or stolen in order to avoid liability if the
gun is traced back to their establishment by federal and state authorities.")  While
the enhancement is correctly applied here as a matter of the Guidelines, <u>see</u> <u>United
States v. Thomas</u>, 628 F.3d 64 (2d Cir. 2010) (rejecting <u>Handy's</u> conclusion that
scienter was required for the enhancement to apply), the lack of scienter certainly
supports a variance. <u>See</u> <u>Handy</u>. 570 F. Supp. 2d at 480 ("Because it lacks a
requirement of scienter, the enhancement does not reflect the seriousness of the
offense, promote respect for the law or provide just punishment for the offense.").

Second, Christen is being held accountable for between 25-99 guns, rather
than for the 5 he is alleged to have sold to the informant, the 13 that were seized in
total in this case (which includes the 8 seized at the sale where Christen was not
present), or for the 8-24 his co-defendant Hall was held responsible for.  PSR ¶¶38-
39.  This is because Christen accepted responsibility for all the guns that appeared
in the photographs he sent the informant in this case, even though he is not
convicted of possessing, transporting, or selling these guns.  As a result, six points
were added to his offense level – *the same number that would be added if Christen
had trafficked 99 guns*.  As such, the six-point enhancement here reflects a
significant overstatement of Christen's offense conduct.

If the Court treated Christen like he was in Category I, removed the
unjustified enhancement for possessing a stolen gun, and only assessed him points
for the guns he actually sold the undercover, his offense level would be 24 and his
advisory Guideline range would be 51-63 months' jail.  This range reflects a more
appropriate "starting point" for the Court to consider in determining a reasonable
sentence under § 3553(a).

### b. The Sentencing Factors Support a Sentence of 36 Months

The factors set out in § 3553(a) support a significant downward variance in
this case.  For the following reasons, a sentence of 36 months' jail, followed by three
years of supervision, would be "sufficient, but not greater than necessary" to further
the goals of sentencing. 18 U.S.C. § 3553(a)

First, the **nature and circumstances of this offense** are serious but mitigated.  Though Christen acknowledges the danger guns pose, there is no allegation that he used guns against anyone or that his conduct was in any way violent.  Rather, as Christen explains in his thoughtful letter to this Court, his conduct was driven by need for money, compounded by a lifetime of chronic poverty and housing scarcity. <u>See</u> **Exhibit A** (Letter of Christen Chen).

Beyond just the financial pressure, research shows that chronic poverty impairs cognitive functioning and contributes to poor decision making.[12]  Indeed, in a key study of Princeton University, researchers found that "poverty and all its related concerns require so much mental energy that the poor have less remaining brainpower to devote to other areas of life. Experiments showed that the impact of financial concerns on the cognitive function of low-income individuals was similar to a 13-point dip in IQ, or the loss of an entire night's sleep."[13]  Just as the Guidelines do not account for a person's level of cognitive impairment (or level of sleep deprivation) at the time of their offense, the Guidelines make no consideration of a person's socioeconomic status in setting forth a recommended range.  As such, an individualized consideration under § 3553(a) requires consideration of a person's poverty.

Second, Christen's **history and characteristics** also weigh in favor of lenience. Despite the difficult circumstances of his upbringing and life, consensus among those who know Christen best – his mom, his sister, and the two women with whom he shares children – is that Christen is a kind, loving, and supportive to a fault. <u>See</u> **Exhibits B-E** (Letters of Support).

Third, the goals of achieving **respect for the law, punishment, deterrence, public safety, and rehabilitation** also support a sentence 36 months. With respect to punishment, Christen has already endured an exceptionally harsh punishment for his conduct, including not only the horrific conditions at MDC – which the government continues to wholly ignore in sentencing considerations, despite MDC being the responsibility of the Department of Justice – but he has also suffered the excruciating pain of missing the birth of his child, and being deprived visitation with his newborn and other small children for months. These conditions are substantively more punitive than what the Sentencing

---

[12] <u>See</u> Anandi Mani et. al., *Poverty Impedes Cognitive Function*, 341 SCIENCE 976-980 (Aug. 30, 2013) https://doi.org/10.1126/science.1238041

[13] <u>Id</u>.; <u>see also</u> Morgan Kelly, *Poor concentration: Poverty reduces brainpower needed for navigating other areas of life*, Princeton University (Aug. 29, 2013) https://www.princeton.edu/news/2013/08/29/poor-concentration-poverty-reduces-brainpower-needed-navigating-other-areas-life#:~:text=Experiments%20showed%20that%20the%20impact,of%20an%20entire%20night's%20sleep.

Commission envisioned in forming the Guidelines in this case, and thus weigh in
favor of a downward variance.

Likewise, with respect to public safety, Christen poses no threat or danger to
public safety.  Despite his obvious access to guns, Christen has never been accused
of using a gun against anyone in any way.  Similarly, with respect to rehabilitation,
Christen has worked closely with Federal Defenders social worker Brittany Larson
to develop a substantive reentry plan aimed at addressing his unmet health and
substance abuse needs upon his release, which – in conjunction with federal
Probation – would reflect the first time Christen has meaningful social work and
reentry support.  See **Exhibit F** (Letter of Brittany Larson, LCSW).  Christen's
work coming up with a reentry plan shows that the goals of rehabilitation are
already being met.

Fourth, the need to **avoid unwarranted sentencing disparities** weighs in
favor of 36 months.  For years, courts in this District have sentenced clients to
comparable or less time for substantively similar conduct.  For example:

- *United States v. Michael Morgan*, 21-cr-566 (PGG), the defendant
  pleaded guilty to conspiring to engage in gun trafficking after selling
  four firearms to an undercover police officer. During the sale, the
  defendant said he acquired the guns in Pennsylvania, claimed the guns
  were the last of 53 he had sold, and discussed his ability to acquire
  assault rifles, silencers, grenades, and rocket launchers. The defendant
  had previously been convicted of second-degree murder and been
  sentenced to 20 years in prison.  He was sentenced to 36 months jail
  and three years supervision.

- *United States v. Victor Maisonet*, 20-cr-118 (JSR), the defendant pled
  guilty to gun trafficking after selling five guns to an undercover officer.
  At 30 years-old, he had five prior criminal convictions, two of which
  were firearms offenses.  The Court sentenced him to 36 months' jail
  followed by three years of supervised release.

- *United States v. Steven Perez (a/k/a "Lucha El")*, 22-cr-644 (JSR),
  defendant was convicted at trial of interstate transport of firearms and
  conspiring to receive guns transported into New York.  His co-
  defendant, a straw purchaser, bought at least 25 guns in South
  Carolina on behalf of the defendant and others. Following the jury's
  finding of guilt, defendant was sentenced to 16 months' jail and three
  years of supervision on each count, to run concurrently, while his co-
  defendant (the straw purchaser) was sentenced to 24 months jail.

- *United States v. Lavar McCray,* 18-cr-034 (AT), the defendant pled guilty to unlawful transport of firearms and being a felon in possession of a gun, for allegedly paying a straw purchaser in Pennsylvania to buy at least ten guns from him and selling them in New York City. The Court sentenced him to 1 day in prison and three years of supervised release.

- *United States v. Omar Lee et. al.*, 15-cr-142 (RWS), defendants charged with conspiring to transport guns from Virginia to New York, sentenced to 14 months jail, 10 months jail, and time served, respectively.

Indeed, courts in this District have even sentenced similarly situated defendants to **supervision only**. *See, e.g, United States v. Anthony Delgado*, Jr., 22 Cr. 426 (AT) (defendant bought 15 guns in Pennsylvania and sold them in New York City, sentencing guidelines 24-30 months, sentenced to two years of supervised release); *United States v. Richard Hall*, 21-cr-643 (ALC) (defendant who trafficked five guns across state lines to New York City, guidelines 24-30 months and sentenced to three years of supervised release including one year of home detention).

Perhaps most important, this Court may look to the sentence it imposed upon Christen's co-defendant, Shaqoya Hall, as a basis for sentencing him to 36 months. According to the government, and contrary to any suggestion Christen was a leader or organizer in the alleged conspiracy, Ms. Hall "was at the center of the scheme from its inception, having acquired firearms in Georgia before making at least three trips between Georgia and New York for the purpose of transporting firearms and participating in each gun sale to the [informant]." ECF No. 33 (Govt. Sentencing Memo, Shaqoya Hall) at 1. Moreover, there is no dispute that Hall partook in a third sale of guns to the informant in which Christen was not involved. See PSR ¶¶30-33. Accordingly, the consideration of relative culpability, which is part of the need to avoid unwarranted sentencing disparities, weighs in favor of a sentence of 36 months.

## CONCLUSION

Christen Chen's life has been shaped by poverty, abuse, violence, health problems, substance abuse, and homelessness. Though he has, at many points in his life, demonstrated his ability to work hard and be a source of financial, emotional, and physical support for his family, he himself has struggled under a lack of support. The circumstances of his upbringing, the draconian probation system in Georgia, the lack of access to physical and mental healthcare and substance abuse treatment, left Christen with few if any tools to navigate the extraordinary financial pressure he found himself under as a new father with a

growing family. Thanks to his poor decision making, he is now separated from his
children in one of the worst jails in the Bureau of Prisons and has missed the birth
of his child, already an extraordinary punishment that has served as a painful and
rattling wake up call. Under these circumstances, a sentence of 36 months jail –
which is significantly more time than he has served before, and his first period of
incarceration as a parent – is more than sufficient to achieve the goals of
sentencing. Such a sentence will ensure Christen never recidivates, and will
accelerate his access to supervision, where he can receive the kind of support he has
long needed, while supporting his family that desperately needs him.

      Thank you for your consideration.

                  Sincerely,

                  _____/s/_____

                  Hannah McCrea, Esq.
                  Federal Defenders of New York
                  (646) 574-0351
                  Hannah_McCrea@fd.org

## EXHIBITS

| | |
|---|---|
| A. | Letter of Christen Chen |
| B. | Letter of Christine Chen, Christen's mother |
| C. | Letter of Cierra Feres, Christen's sister |
| D. | Letter of Kayla Mitchell, the mother of Christen's son J |
| E. | Letter of Niesha Simoes, the mother of Christen's son |
| F. | Letter of Brittany Larson, LCSW |
| G. | Transcript, United States v. Juan Diaz, 23-cr-260 (LGS), January 16, 2024 |

# EXHIBIT A

Dear Honorable Judge Rochon,

It's very hard to find the words to say. As I have been incarcerated, I have realized that this is not the life that I want to live. I understand that I made some wrong decisions in my life, but I don't want to be viewed as that kind of person anymore. I know that I messed up, really bad. I'm here today to ask for forgiveness.

Growing up, it wasn't easy to find sources of income. I always wanted to be a basketball player, but after my surgery at age 14, I knew that wasn't going to be possible. I didn't have a lot of support. Me and my mother started butting heads, and everything was about my sister who was sick with alopecia. I don't want to blame my father, but at the same time, he was a stranger until I was 15. I saw a lot of violence growing up. We didn't have a lot of resources. I felt like I needed to fend for myself to survive from a very young age. That was the mentality I grew up with.

Today, I know I don't need to be that person anymore. I got involved in this crime to make money and help my family. But I understand that wasn't the right thing to do. There's a right way and a wrong way to go about things, and I went down the wrong path. People do make mistakes and can learn from them.

I'm writing this on September 13, which is my 29th birthday. I am upset at myself for being here. More than anything, I'm very sorry to my kids. They don't have their father home right now, the one who is supposed to take care of them. My family is struggling and I'm not there to help. My father broke his back and neck and I'm not there to help him, either. My mother is struggling too and I can't help her.

My time at MDC has made me realize I never want to do this again. At all in my life. I don't even want to get a traffic stop anymore. This place is horrible. It's hard to get access to programming, I've been trying to get my GED for the last 8 months. I've asked for a psych evaluation and haven't been seen. I've put in requests for medical and it takes weeks. Not to mention the violence here. I don't think anyone who hasn't actually been inside the four walls of MDC understands what's it like, to be degraded and made to feel like you're not human.

I know that I've done time before, I did 18 months in Georgia and came home in 2019. But I was younger, I didn't have anyone to live for at that time. So my thought process was different at that point. Doing time 5 years ago was not as hard as it is now. Now I'm living for my kids and that pain is different. Not even being able to call them, talk to them, or see them due to the lockdowns and my kids' moms getting turned away for visits. I don't want to live up to the stereotype of a Black man who goes in and out of jail. My son is four months old and I haven't seen him in three of those months. He was born while I was in MDC and that breaks my heart. I don't want to be for my kids the way my father was for me.

At MDC, I've been spending my time working in the kitchen, taking every class possible, reading, working out. I haven't caught any infractions. I want to show that I can reenter the world and do

the right thing that I'm supposed to. Which is to take care of my family. I'm going to make something good out of my life. My long term goal for my life is to restart my business that I started in 2022, which was a roadside assistance company like AAA. I know that the skills I have, I can use for good. In the short term to reach that goal though, I'm willing to do even menial work if it means I can support my family. I won't turn down the wrong path, no matter how long it takes. It's not about how much money you make, it's about your momentum. I'll be the guy with 8 jobs if I have to.

I've been here for eight months but it's felt like a lifetime already. I just want to say that I'm extremely sorry. Please Judge, for the sake of my children, please help me get home to my kids.

Sincerely,

Christen Chen

# EXHIBIT B

Hello Judge Rochon,

My name is Christine Chen-Thorbourne. Christen Izaha Chen is my son. Growing up with his three sisters and his brother, he was the oldest brother and the one they looked up to. So as the big brother he made sure they would go to school and stay positive. For his brothers and sisters he was always there. He was not just like a big brother but like a dad to them. Whenever I needed an extra hand, he was my right hand. Whether that was tuning my car up, picking up his siblings, or anything, he was the one I could call.

Growing up in N.Y. was rough. Christen was moved from N.Y. in 2011 to the state of Georgia where he went to school. He started playing football. He was great at it but had to stop due to a bone deformity. Later, he moved to North Carolina with his dad and his side of the family. This is where he started working with his dad in moving furniture. Christen was always an awesome kid, the guy you wanted to be around. He's funny. But underneath all that, he's been through a lot. All my kids have.

My oldest daughter was diagnosed with alopecia, lost all her hair, and had to undergo treatment from a very young age. This impacted the entire family including Christen. Christen's father and granddad were both incarcerated, meaning the male figures were not there for him and the females of the family had to be strong. My kids have witnessed people being shot and killed. Christen definitely had to grow up fast. I had another child I had to bury after Christen that died at birth. That was very difficult for us all. Also, being that Christen was always a big kid, he's had negative encounters with the cops since he was a teenager.

In 2020, we went through a fire. Me and Christen's sister almost lost our lives when someone burned our apartment down. Christen had to come and take us to the hospital. Later, my oldest daughter got hit by a car and almost lost her life. That's how things have been in our family. As soon as one thing happens and we are trying to heal from it, another thing happens. It's been trauma after trauma after trauma. Most recently we had a death in the family. The family is battling homelessness, with my younger daughter in a shelter in NYC and me bouncing around different hotels in Gwinnett, GA. Christen's father fell and hurt himself and had to get an emergency surgery. Through it all, Christen has always played the role of that big brother that everyone depends on.

This guy's heart is made of gold, and I'm not just saying that as his mother. He would give you the shirt off his back, he's a very selfless person. He is a strong-minded person and respectful. Christen has made me proud as a mom. He makes me laugh, he makes me feel loved, the hugs that he gives are great. We're still praying together and mentally have each other's backs. We're thankful each day we wake up to a new day. But things have been a struggle.

Christen being locked up now is different than in the past because he has kids. In the past he wasn't a father. He was still a young kid trying to find his way in life. Now, everything is different. He wants to be there for his sons and it hurts him that he's in there. Christen is a better dad than his dad was. Him not being here for his boys is driving everyone insane. His kids, his kids' mothers, his brothers and sisters, and I all need him. We will support him when he comes home, please just help him get home to us.

Christine Chen

# EXHIBIT C

Dear Judge Rochon,

Hi, I'm Cierra Feres, I'm 23 and I'm one of Christen's little sisters. It's 5 of us in total plus a little sister on our dad's side. Christen is the second oldest sibling of the bunch.

Growing up was not easy, we didn't have our birth father growing up, he was incarcerated for 16 years on and off, and we had a verbally abusive stepfather instead. Christen, me, and the siblings who came from our birth father's side of the family always felt like we were doubted, we were made to feel like we wouldn't ever amount to much. Our mother was the type of person who made the best of everything. Yet because she was (and still is) in a bad marriage where our stepfather would make her choose between him and us, she didn't always give us all her attention. We don't have any resentment towards her, but there were times where we were kicked out after she and our stepdad got into a fight. Other times, we chose to leave the house rather than deal with it, even though we had nowhere to go. I remember I had to jump from house to house, crashing with my friends just to finish high school. Our stepdad also tried to put his hands on our mother at times and Christen would be the one who always stepped in to protect her. He has always been the man of the house since we were young.

My brother was very smart, funny, and generous growing up. He still is. He used to take me to the park to play basketball with me. He would buy me shoes. He always treated me more like his daughter than his sister because of the age gap. When I got older and we no longer lived in the same state, he would still pull up from North Carolina or Georgia if a boyfriend or friend made me feel some type of way. He was always like my savior. It's great having a brother like him.

Christen's disadvantage was him always being the "big guy" growing up. As children we lived in Brooklyn, then ended up moving to Staten Island. Christen was 15 and I was only 10 the first time I saw my brother handcuffed and wrongfully profiled. We were in front of our local deli across the street from our house, he wasn't doing anything wrong, he wasn't even the profile they were looking for, but he was the tallest and most "grown" looking out of his friends in the group. My mother had to come out crying and explaining to the cops that my brother wasn't the subject and yes, he was only 15.

In 2011, we moved to Atlanta to have a fresh start. Christen then went to try and live with our dad, but that wasn't easy either because my dad is very narcissistic and difficult to deal with. Christen ended up dropping out of school because he was more worried about making ends meet. His hardships and legal issues have always come from him needing money. That's how he ended up getting locked up in the first place. As the second oldest, he felt that pressure to take care of us all.

What Christen really needs is someone to talk to, someone to give him hope and freedom. Not just physical freedom but also emotional freedom. Childhood trauma has definitely affected how he moves and acts now, and he is starting to really realize that. I tell him that even if the family needs things, even if his kids need things, our biggest priority is for him to be good. We're still

proud of him even if he can't support us financially. Christen realizes now that he's not 16, 18 years old anymore. He doesn't have to be responsible for his parents and their choices; rather he just needs to focus on taking care of himself and his kids.

It's time to break generational curses. He has two boys. He doesn't want them to go through the same journey that we went through with our father. We grew up going to the jail and vising our dad but I didn't really know him until I was 13, 14 years old. Christen understands that he has to do better, he has to be here to be a father. We talk about his future goals of owning a business. Christen would benefit from job support through programs like Osborne.

Since he's been locked up, Christen has been working in the kitchen and trying to spend his time productively. He doesn't want the fast life anymore. He wants to do things right this time. MDC is not like any place he's been before. He's in a different place both literally and emotionally. This is the climax moment. He knows it's this or his real life back. He wants to move forward, not backward. Your Honor, please give him a chance to come home sooner. Christen understands this is the last chance he'll get and he won't waste it. Thank you.

Sincerely,
Cierra Feres

# EXHIBIT D

Dear Judge Rochon,

My name is Kayla Mitchell. I recently moved from North Carolina to New York. I share a child with Christen, our son J    l. He is turning 2 years old in December.

I've known Christen for over 11 years now. His dad had brought him down to Charlotte and that's where we met and first started our relationship. We then reconnected in 2019 and moved to Atlanta. Having known him for this long, I have seen some of the struggles he has faced with his family. From a young age, he was the main provider for himself and was helping me as well. I would say that his family was not always there for him and he had to figure out a lot of things alone. Back in about 2020, we were homeless and lived in the park. We had to fend for ourselves. His relationship with his dad was on and off, sometimes they had a good relationship and his dad helped support him financially. Other times not so much. With his mom, she lived close by when we were homeless and still didn't give us much support. He was always stressed about us getting food and getting into shelters, and his family wasn't able or willing to help. I can say that his family is more emotionally supportive now but generally he is the one supporting them more than they are him.

Because of this, Christen has struggled with how to carry things emotionally. He sometimes gets upset or angry because he doesn't know how to carry it all. That's something he's trying to work on for himself. I'm seen that he's more open to speaking about things now, like about how he's feeling. Before it was not easy to talk about stuff and all that. He's changing and maturing more. Starting to understand that he needs to be a better person, a better man for his kids. Being away from his sons right now hurts him. He knows he wants to be better for them.

Growing up without both my parents in the home has taken a very serious toll on me. I wouldn't want that for our son            The two of them have a great bond. When Jah was first born, he always slept with Christen. Christen would help me with everything from feeding him to bathing him. It's been a while since J        has been able to see his dad because of issues with the jail and the new visiting policy. But they talk on the phone.            gets excited as soon as he hears his dad's voice on the phone. In general I would say it has really affected our son not to have Christen home. He screams and cries a lot more now. I don't want Christen to come home when Jah is already ten, eleven, twelve years old.

Your Honor, Christen made a very bad mistake in doing what he did. But he's not a bad person or a hardened criminal. What he really needs is therapy, to sit and talk about his emotions with someone. He needs guidance, maybe some kind of mentor or spiritual guidance. Someone who can actually support him. He needs support finding a job on the books, something to keep him positive. I know that this has been a big wakeup call for him and he's more open to asking for help now. We're just asking for one more chance for Christen.

Thank you for your time in reading this letter.

Sincerely,
Kayla Mitchell

# EXHIBIT E

Dear Judge Rochon,

My name is Niesha Simoes. I currently work as a Direct support specialist for people with mental disabilities in Staten Island, New York. I am writing this letter to ask for leniency at Christen's sentencing. I've known him for over ten years and been dating him for 4 years. I am the mother of his son        who is now just 5 months old. He also helped raise my 4-year-old        since he was 6 months old.

Me being born to a drug addicted mother and not knowing who my father was, and Christen's father being incarcerated for over 16 years, we both have abandonment and trust issues that we try our best to not pass on to our children. Being that his dad was locked up and his mom was alone, she put a lot of pressure on Christen to grow up faster than he should have. He was the one who helped out with bills when the lights went off, the one who took care of his siblings. He had a harder childhood than the rest of us growing up. He had a bad relationship with his stepdad. He heard a lot of yelling and screaming and violence in the house with his mom and stepdad and had to step in. Plus he looked big for his age so even just hanging out outside, cops would stop him like he was a grown man. He's been a man since he's been a boy, learning to figure it out on his own, and in his world there weren't positive role models for what a man is.

There was a lot of tribulations that Christen and his entire family were going through, and I know that Christen felt the walls closing in on him. At the time he got caught up in this, he felt that he had no other options to be able to help his family financially. Being that he had a record, no one was hiring him. And he had his back against the wall because a lot of people would look to him for help. His mom, brothers, and sisters. Whenever anyone needed financial help, they would reach out to him and that put a lot of stress on him.

Despite his rough upbringing, Christen is such a sweetheart. I've never seen him be violent. He's very supportive and understanding. He helps me stay grounded. I get overwhelmed really bad and I have anxiety. He helps me balance day to day life a lot. Christen is a great father and he's been the only stable father figure my 4 year old son knows. He has helped me physically and financially when he could, but most importantly he was present physically and emotionally for        . He was there for        s first day of school last year. He took him on the plane for the first time to go to Atlanta. He took care of him when he was sick, would feed him, bathe him, and help me around the house. And he's good with        emotionally.        biological dad will always promise to show up but doesn't, and that leaves Saiyon sad. Christen does his best to cheer him up and show him what a father should do.

That's why this time incarcerated is so different for Christen. He's never been locked up with kids before. Now he has two kids plus        It's different for him being a father away

from his kids. I was completely devastated when I discovered Christen was arrested on federal charges especially because I was six months pregnant with our son Emotionally it takes a toll to give birth by yourself. I have a newborn baby and 4 year old, and no financial help. Kayla, who is the mother of Christen's other son, moved up from North Carolina so that we could parent together. That's made it easier to try and take the kids to see Christen. But the last few months have been extremely difficult and it shows in behavior. Christen and I both know how important a father is. And our son has not had that. Christen doesn't want to be like his dad. He wanted to be there for his kids. And he's very sorry he has put himself in this situation. With the new visitation policy change, we have not been able to see him in weeks. That also takes a toll on us all. But he talks to through the phone as much as possible.

Christen and I talk frequently about how sorry he is. I don't think he was really thinking about what he was doing and how much time that would take from his life. He has dreams and ambitions. He wants to own his own business. He needs guidance and help to get there, and he's never gotten that. He wants to get a career and be stable in the community. In the past, I would bring things up like the GED and he wasn't interested, because he didn't think it would help our financial situation. Now he's interested in getting his GED, getting a trade. We talk about how much he wants to find something legit. He wants to be a law-abiding citizen. Your Honor, we're not asking for a slap on the wrist. We're asking for help. Christen wasn't trying to contribute to violence or hurt anyone. He comes from the south where guns are not seen as negatively. But he understands completely that what he did is wrong. Christen is the anchor to our family and he is needed. I'm just asking that you have leniency on him this one time and you won't see him in your courtroom ever again. We will make sure of that.

Sincerely,

Niesha Simoes

# EXHIBIT F

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

*Jennifer L. Brown*
*Attorney-in-Charge*

Hon. Jennifer L. Rochon
United States District Court
Southern District of New York
500 Pearl St.
New York, NY 10007

September 30, 2024

Re: United States v Christen Chen
24 Cr. 77 (JLR)

Dear Judge Rochon,

I am a New York State-licensed clinical social worker and have worked at Federal Defenders since 2014. Our Client and Mitigation Services Department works with clients to provide support during incarceration and reentry and to identify areas of need and appropriate community resources. I have met with Mr. Chen at the MDC Brooklyn, have spoken with him by telephone and reviewed the PSR and other case documents.

I write to provide information about Christen Chen's efforts to reflect on his current circumstances, manage his behavior and to describe how Mr. Chen, with support from our office and the Probation Department, may continue with these efforts in the community.

## **Background**

For generations, Mr. Chen's family has experienced challenges associated with migration, poverty, incarceration, homelessness, and trauma.  As the eldest son, he has endeavored to support his parents and siblings throughout his adolescence and young adulthood. His mother is a dishwasher who struggles with housing instability; Mr. Chen still sends her money to help make ends meets. His father is significantly disabled from driving trucks and performing manual labor, the only work he could secure after lengthy incarceration.

Mr. Chen and his family have never had sufficient resources to meet their basic needs. Indeed, there's an important relationship between mass incarceration and poverty: "the impact of incarceration exacerbates poverty and hunger... [and] the criminalization of poverty drives mass incarceration... through (1) over-policing and overcriminalization, (2) mandatory minimums and generally harsher sentencing practices, and (3) community supervision and the ongoing restrictions formerly incarcerated individuals face after being

1

released from prison."[1]  No one in his family has escaped poverty and many have struggled with legal involvement instead of having the opportunity to secure their survival and the help they need. Upon release from state custody in Georgia and under community supervision, he could have been connected with healthcare and avenues to secure an income.  Instead, the cycle of poverty, incarceration, and desperation continued, ultimately leading to the poor decisions underpinning the instant case.

Now, Mr. Chen has a young family and is desperate to be a present and providing father to his children:          ,          and his                    However, in addition to struggling with intergenerational poverty, Mr. Chen suffers from physical disabilities and untreated mental health challenges, which led to self-medicating through substance use, negatively impacting his ability to earn income and provide for his family.

Mr. Chen's economic circumstances have meant that he has never received appropriate physical health, mental health, or substance use treatment. Moreover, consistent with someone who meets the diagnostic criteria for addiction, he also used substances despite the negative consequences.  His drug use contributed to the extremely poor decision making that led to the conduct in this case.  Accordingly, this letter focuses on how Mr. Chen is committed to more seriously addressing his medical, mental, and substance abuse-related health upon his reentry into the community.

Mr. Chen and I have identified the following resources to secure the support he needs to avoid further contact with the legal system.

## Physical Health

**Community Health Action Staten Island** is part of Sun River Health Network and offers a variety of services including medical care and dental care. They accept Medicaid health insurance. Mr. Chen would be able to meet with a primary care doctor and receive referrals to the necessary specialists to take care of his leg and ongoing symptoms (perhaps pain management and physical therapy).  Access to consistent and affordable care will help Mr. Chen avoid substance use to manage pain.

## Mental Health and Substance Use

When discussing his past and how he arrived at this moment, Mr. Chen was honest and insightful. I asked him what might help him in the future. "Maybe therapy," he responded. "I have some stuff to get off my chest" (including racial trauma, and family trauma). "I'm walking around with wounds."

---

[1] Borrelli, Brianna. "The Interplay of Mass Incarceration and Poverty." *Georgetown Journal on Poverty Law and Policy*, vol. 30, no. 2, 2023, pp. 287-313. Available at https://www.law.georgetown.edu/poverty-journal/wp-content/uploads/sites/25/2023/05/The-Interplay-of-Mass-Incarceration-and-Poverty.pdf

Behavioral healthcare includes psychiatric assessment to establish patient needs and relevant diagnoses, individual therapy with a credentialed provider, the prescription and monitoring of psychotropic medication, and substance use treatment.  Mr. Chen needs to be assessed to understand if he meets the criteria for Cannabis Use Disorder or a substance use disorder involving benzodiazepines, amphetamines, or narcotics.

Service providers must be willing and able to work creatively to support individuals who face complex stressors and barriers to success, like access to transportation, food insecurity, or continued substance use. For Mr. Chen, it would be counterproductive for a therapist to require abstinence immediately to participate in services; a more appropriate treatment goal may be attending appointments regularly, building rapport with providers and encouraging decreased substance use.

The Substance Abuse and Mental Health Services Administration, part of the United States Department of Health and Human Services, details the need for person-centered behavioral healthcare:

> *Recovery is a process of change through which individuals improve their health and wellness, live a self-directed life, and strive to reach their full potential. To be effective, mental health and substance use treatment and services must be based on recovery-oriented and person-centered practices. Such services have demonstrated to improve individuals' quality of life, health outcomes, and social support as well as decrease stigma.*

> *Person-Centered Approaches [include]:  Informed Consent, Person-Centered Planning, Shared Decision Making, Relationship Building, Respectful Communication, Trauma-Informed, Least Restrictive, Engagement, Resilience and Strengths-Based, Culturally Centered, Wellness Focused and Whole Person Care, Harm Reduction, Peer and Family Support, Recovery-Oriented System of Care.*

Some of these strategies have also proven useful for our Social Work Department as we collaborate with United States Probation to support individuals working to reach their goals on post-release supervision.

Mr. Chen is motivated to get help for his addiction to avoid the negative consequences associated with substance use. The **Center for Health Action Staten Island** (CHASI) offers comprehensive substance use treatment.  Its **Next Step Resource Center** offers: individual recovery coaching and support, program identification from detox, to outpatient to inpatient, support for individuals and families, 12 step meetings, and yoga, wellness and creative workshops.

> *CHASI's Next Step Center is a hub for people and families coping with drug and alcohol addiction and substance use. We offer options for people seeking treatment, activities and workshops for people engaging in recovery, and*

3

*support for families helping a loved one. The Center in St. George is open 24 hours a day, 7 days a week, 365 days a year.*

*We offer medication-assisted treatment programs in our offices and connections to detox, outpatient, or inpatient services with other providers. We can help you find a program you can afford. Some programs are free. You can rely on Next Step peers and staff to help you every step of the way.*

The behavioral health team at Center for Health Action Staten Island offers counseling and support for people with a history of substance use. Mr. Chen will be able to receive therapy for the first time with a therapist familiar with both substance use and mental health.  It will be useful to have Mr. Chen's primary care doctor, therapist, and his substance use treatment providers as part of the same network since pain management is an issue and a trigger for use for Mr. Chen.

## Identification

Mr. Chen needs to gather his identifying documents to apply for jobs, benefits, and entitlements. His Georgia state driver's license and social security card were seized upon arrest. Our office will support Mr. Chen in retrieving these documents. In the case that they cannot be found or returned, we will help him apply for a new social security card from the **Social Security Administration** and a New York State Driver's License at the **New York State Department of Motor Vehicles**.

Mr. Chen needs to apply for his birth certificate at the **New York City Bureau of Vital Statistics** located near Foley Square at 125 Worth Street, NY, NY 10013. Our office is able to assist with the costs and logistics associated with obtaining these documents.

## Income and Employment

Mr. Chen is motivated to find a career and support himself and his family. Given his physical injuries and the challenges of having a criminal record, he is open to support. He is eligible for vocational rehabilitation and training through the New York State Department of Education's vocational rehabilitation program.

1. **Adult Career and Continuing Education Services- Vocational Rehabilitation (ACCES-VR)**

The Adult Career and Continuing Education Services - Vocational Rehabilitation (ACCES-VR) is a statewide program intended to help people with any type of disability to receive ongoing case management, training, and job placement to reach their potential in the labor force.

Once accepted, Mr. Chen would be assigned a counselor and they would work together to identify his skills and interests, participate in appropriate training, and be

4

placed in a job. The Individualized Plan for Employment (IPE) they develop together is driven by the participant's skills and interests. ACCES-VR is accustomed to working with people who receive social security benefits, and so their staff know how best to help someone enter the workforce without triggering an abrupt, and often disruptive termination of disability benefits.  Mr. Chen could also access a GED program as part of his Plan for Employment. Many of our clients have utilized ACCES-VR with success. Mr. Chen is interested in small business, manual labor, vending machines, long-haul trucking, and roadside assistance.

    **2. Supplemental Security Income**

    Mr. Chen would like to work and support himself. However, given his disabilities, if he and his doctors determine that full time employment is not possible, he may consider applying for supplemental security income. Our office can collaborate with U.S. Probation and his providers to support the application process for Supplemental Security Income.  The Social Security Administration will assess if his disabilities preclude him from full time employment and if so, disburse disability income.

**Looking Forward**

    With appropriate medical and mental health care, Mr. Chen will be able to assess the best pathway to support his family: full time employment or part time employment and disability income. Federal supervision will be a significant challenge for Mr. Chen - he will continue to feel the pressure to support his family. However, Mr. Chen now understands that he cannot be the provider he aspires to be without attending to his own needs first. The treatment plans detailed above will require repeated appointments and engagement on his part.

    An extended term of incarceration would further delay the treatment Mr. Chen desperately needs, stigmatize and discourage him, and deprive his family of the co-parent and father who is eager to provide for them. Our office is able to collaborate with U.S. Probation to support Mr. Chen on supervision as he works to be the best provider he can be.

Respectfully submitted,


_____/s/_____

Brittany Larson, LCSW
Mitigation & Social Work Supervisor, Southern District
Federal Defenders of New York

# EXHIBIT G

1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

       - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        : 23-CR-56(LDH)
                                 :
                                 :
       -against-                 : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 :
                                 : April 10, 2024
BAYRON GARCIA,                   : 12:00 p.m.
                                 :
          Defendant.             :
                                 :

       - - - - - - - - - - - - - X

          TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
         BEFORE THE HONORABLE LaSHANN DeARCY HALL
            UNITED STATES DISTRICT COURT JUDGE


A P P E A R A N C E S :

For the Government:  BREON PEACE
                     United States Attorney
                     Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
                     BY:  LAUREN BOWMAN
                          Assistant United States Attorney

 For the Defendant:   FEDERAL DEFENDERS OF NEW YORK
                      One Pierrepont Plaza
                      Brooklyn, New York  11201
                     BY:  ALLEGRA GLASHAUSSER, ESQ.

Court Reporter:  Michele Lucchese, RPR, CRR
                 225 Cadman Plaza, 373N
                 Brooklyn, New York 11201
                 718-613-2272
                 E-mail:  MLuccheseEDNY@gmail.com
```

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

```
               Proceedings                    2
```

1          THE COURTROOM DEPUTY:  All rise.

2          Good afternoon.  This is a criminal cause for a

3  sentencing in the matter of USA versus Bayron Garcia, Docket

4  No. 23-cr-56.

5          The Spanish interpreter has been previously sworn.

6          Can counsel please state their appearance for the

7  record, starting with the Government.

8          MS. BOWMAN:  Good afternoon, Your Honor.  Lauren

9  Bowman from the United States and I'm joined at counsel table

10 with a member of probation.

11         THE PROBATION OFFICER:  Good afternoon, Your Honor.

12 Ashtin Audain from the Probation Department.

13         THE COURT:  Good afternoon.

14         MS. GLASHAUSSER:  Good afternoon, Your Honor.

15 Allegra Glashausser representing Mr. Bayron Garcia.  We are

16 also joined by Karina Barucha, a paralegal at the Federal

17 Defenders.

18         THE COURT:  Good afternoon to you as well.  You all

19 may be seated.

20         Okay, folks.  So we are here today for a sentencing

21 determination on the indictment against the defendant, Mr.

22 Garcia.

23         Present today are counsel for the Government, as

24 well as the defense, who have noted their appearance for the

25 record, Mr. Garcia and a representative from the Probation

1  Department.

2          Now, on August 17th of 2023, Mr. Garcia pleaded

3  guilty before Magistrate Judge Bloom to a lesser included

4  offense within Count Two of a two-count indictment which was

5  filed on February 7, 2023.

6          Now, the lesser included offense within Count Two

7  charges that in November of 2022, the defendant possess with

8  the intent to distribute cocaine in violation of 21, U.S.C.,

9  Section 841(a)(1) and U.S.C., Section 841(b)(1)(C).

10         Now, Count Two charges that in or about November of

11 2022, within the Eastern District of New York and elsewhere,

12 the defendant, Bayron Manuel Garcia, together with others, did

13 knowingly and intentionally possess with the intent to

14 distribute a controlled substance, which offense involved five

15 kilograms or more of a substance containing cocaine, a

16 Schedule II controlled substance, in violation of 21, U.S.C.,

17 Section 841(a)(1), U.S.C. 841(b)(1)(C).

18         Now, in advance of this proceeding, I received and I

19 reviewed a February 7, 2023 indictment filed as ECF Docket No.

20 10, defendant's August 17, 2023 agreement with the Government,

21 a January 11, 2024 presentence investigation report filed as

22 ECF Docket No. 30, a February 26, 2024 sentencing memorandum

23 filed by the Government as ECF Docket No. 32, a March 28, 2024

24 sentencing memorandum filed by the Government as ECF docket

25 No. 33, and an April 12, 2024 addendum to the presentence

```
                     Proceedings                        4

 1   investigation report.

 2            Now, does the Government have any other documents,

 3   submissions it would like to put before the Court at this

 4   time?

 5            MS. BOWMAN:  No, Your Honor.

 6            THE COURT:  Ms. Glashausser, the same to you?

 7            MS. GLASHAUSSER:  No, Your Honor.

 8            THE COURT:  To the Government, do you have any

 9   witnesses present in the courtroom today?

10            MS. BOWMAN:  No, Your Honor.

11            THE COURT:  Am I correct you don't believe that we

12   need to hold any sort of evidentiary hearing to resolve any

13   disputed issue of fact?

14            MS. BOWMAN:  That's correct, Your Honor.

15            THE COURT:  Ms. Glashausser, have you and Mr. Garcia

16   read and discussed the presentence report?

17            MS. GLASHAUSSER:  Yes, Your Honor.

18            THE COURT:  All right.  Have you discussed whether

19   you have any objections thereto?

20            MS. GLASHAUSSER:  Yes, Your Honor.

21            THE COURT:  And you don't have any witnesses present

22   here today, am I correct?

23            MS. GLASHAUSSER:  No, Your Honor.

24            THE COURT:  And you don't believe I need to hold any

25   sort of evidentiary hearing to resolve any disputed issue of
```

```
                    Proceedings                        5
```

1    fact?

2              MS. GLASHAUSSER:  That's right, Your Honor.

3              THE COURT:  All right.  Let me talk about the

4    maximum sentence available here.

5              With respect to Count Two, 21, U.S.C., Section 841

6    (b)(1)(C) permits the Court to sentence Mr. Garcia to a

7    maximum term of 20 years.  Any term imprisonment that is

8    ordered must be followed by a term of supervised release of at

9    least three years.  Because Count Two is a Class C felony, Mr.

10   Garcia is eligible for not less than one, no more five years

11   of probation, and either a fine, restitution or community

12   service must be imposed as a condition of probation absent the

13   existence of extraordinary circumstance.  The maximum

14   statutory fine is a million dollars.

15             I must also impose a mandatory special assessment of

16   $100 per count, and that is pursuant to 18, U.S.C., Section

17   3013.

18             Now, the PSR calculates an effective guidelines in

19   this case at 37 to 46 months.

20             Am I correct that there are no objection that need

21   to be resolved?

22             MS. BOWMAN:  That's correct, Your Honor.

23             MS. GLASHAUSSER:  That's right, Your Honor.

24             THE COURT:  I will calculate the advisory guideline

25   range in this case.

```
                        Proceedings                         6

 1          The applicable guidelines for a violation of 21,
 2   U.S.C., Section 841(a)(1) is Sentencing Guidelines Section
 3   2D1.1.
 4          Now, pursuant to Sentencing Guidelines Section
 5   2D1.1(a)(5), the drug quantity table is referenced when
 6   determining the offense level.
 7          The defendant is responsible here for 11.2 kilograms
 8   of cocaine.
 9          Now, because the defendant is responsible for at
10   least 5 kilograms but less than 15 kilograms of cocaine,
11   pursuant to the drug quantities table, the base offense level
12   for this offense is 30.
13          Now, the defendant has not satisfied all five
14   factors under Sentencing Guidelines Section 5C1.2 in that he
15   has not provided a complete and truthful statement to the
16   Government regarding the offense, so he is ineligible for a
17   two-level safety valve reduction.
18          Because Mr. Garcia played a minimum role here, was a
19   minimal participant, the offense level is decreased by four
20   levels.
21          Because he is a zero-point offender and meets the
22   criteria referenced at Sentencing Guidelines Section
23   4C1.1(a)(1) through (10), the offense level is further
24   decrease creased by two.
25          I also find that Mr. Garcia demonstrated acceptance
```

Proceedings                                                        7

1    of responsibility for the offense and accordingly, the offense

2    level is decreased by an additional two levels.

3              Is the Government moving for an additional one point

4    reduction?

5              MS. BOWMAN:  Yes, Your Honor.

6              THE COURT:  Okay.  The motion is granted.

7              Accordingly, the total offense level applicable here

8    is 21.

9              As to Mr. Garcia's criminal history, the Court

10   calculates a total criminal history score of zero.  Pursuant

11   to the Sentencing Table at Chapter Five, Part A, a criminal

12   history score of zero establishes a criminal history category

13   of one.  With a total offense level of 21 and a criminal

14   history category of one, the Court calculates a corresponding

15   advisory guideline range of 37 to 46 months' imprisonment.

16   The guideline term of supervised release is three years.

17             Mr. Garcia is not eligible for Probation because his

18   guideline range is within Zone D of the Sentencing Table and

19   the guideline fine range here is 15,000 to $1 million.

20             Are there any objections, folks, to the Court's

21   calculation of the guidelines range?

22             MS. BOWMAN:  Not from the Government, Your Honor.

23             THE COURT:  Thank you.

24             MS. GLASHAUSSER:  No, Your Honor.

25             THE COURT:  All right.  I failed to mentioned that

Proceedings                                          8

1    the Court is adopting the PSR in full.

2              And at this time I would like to turn to the

3    question of departures.

4              Does any party wish to make any arguments concerning

5    authorized departures in this case, hold any arguments

6    specific to variances for later?

7              Anything from the Government?

8              MS. BOWMAN:  No, Your Honor.

9              MS. GLASHAUSSER:  No, Your Honor.

10             THE COURT:  Okay.  Having calculated the guidelines

11   and considered the propriety of a departure, I must now

12   consider the relevant factors set out by Congress in 18,

13   U.S.C., Section 3553(a) to ensure that I impose a sentence

14   that is sufficient, but not greater than necessary, to comply

15   with regard to the purposes of sentencing.

16             Now, these purposes include the need for the

17   sentence to reflect the seriousness of the crime, promote

18   respect for the law and to provide just punishment for the

19   offense.

20             The sentence should also deter criminal conduct

21   protect public from future crime by the defendant and promote

22   rehabilitation.

23             In addition to the guidelines and policy statements,

24   I must consider the nature and circumstances of the offense,

25   the history and characteristics of the defendant, the need the

Proceedings                                                    9

1   to avoid unwarranted sentence disparities among

2   similarly-situated defendants, the types of sentences

3   available, and the need to provide restitution to the victims

4   of the offense.

5           Does the Government wish to argue about the

6   application of the 3553(a) factors or otherwise make a

7   sentencing recommendation?

8           MS. BOWMAN:  No, Your Honor.

9           THE COURT:  Okay.  Ms. Glashausser, can I hear from

10  you?

11          MS. GLASHAUSSER:  Thank you, Your Honor.

12          Your Honor, Bayron Manuel Garcia just celebrated his

13  24th birthday two days ago.  Unfortunately, instead of

14  celebrating, he spent the day in the hospital with his baby's

15  son.  His son was admitted four or five days ago with a

16  mosquito-borne illness and he is still in the hospital today.

17          Every day since his son was admitted to hospital, he

18  has gone in the morning to the hospital before starting his

19  work shift.  I can see that he is tired just looking at his

20  face.  He's very worried about his son.

21          At 24 years old, he is still very young, but he is

22  already growing into an adult who is able to take care of his

23  responsibilities.

24          Today he is a man who is able to handle hard life

25  setbacks, like his son being in the hospital with maturity.

Proceedings                                           10

1    He is taking care of his family.  He is taking care of his son

2    while still going to work, while still preparing for

3    sentencing, which is obviously an extremely important moment

4    in his life.

5              This maturity is new for Bayron.  He was only 22

6    years old when he was arrested in this case.  He seemed even

7    younger.

8              I think that he seemed even younger because as he

9    was becoming a young adult, two disasters happened not just in

10   his life but in the world.  In 2017, Hurricane Maria knocked

11   out power to the entire island of Puerto Rico where he lived.

12   He was just starting his second year of college or second

13   semester of college.  This upended his plans.  He was planning

14   to become a P.E. teacher.  That's what he was studying for.

15   But in the context of that hurricane and the need his family

16   had for more money -- his mother, him.  He is the oldest.

17   There are younger siblings -- he couldn't really justify going

18   to school spending money on that instead of trying to get a

19   job.  He dropped out.

20             Just when things were starting to improve after the

21   storm, the pandemic hit.  That's when Bayron was only 20 years

22   old.  At that point he felt completed defeated.  His adult

23   life had failed to really take off.

24             When that second disaster, the pandemic, started to

25   ease up, Bayron finally got a job.  It seemed like maybe

```
                        Proceedings                      11
```

 1   things were going to look up and go in a better direction, but

 2   then his car broke down.  And this was a personal disaster

 3   because he needed to get his car to go to work and he could

 4   not afford to fix it.  The hurricane, the pandemic, now a

 5   broken car, these three bad events halted his progress towards

 6   becoming a mature adult.  None of those were his fault, but

 7   combined, they were just more than Bayron could handle.

 8            And that's when he made an extremely bad decision.

 9   And there was a fourth disaster.  This time it was Bayron's

10   fault.  That's when he decided to bring drugs to New York, and

11   that's why we are all here today.

12            So what's the right response?  The guidelines are 37

13   to 46 months.  I know Probation is requesting a sentence

14   within that guideline.  But I would urge Your Honor to find

15   that that would be a mistakes.  The guidelines are largely

16   driven by the drug amount, something that is not Bayron's --

17   wasn't his choice and don't show his culpability.  And it

18   wouldn't serve the sentencing factors.  Bayron has already

19   been specifically deterred.  He has been afraid throughout

20   this process.

21            I don't know if Your Honor can see him, but he has

22   been kind of shaking since I met him this morning.  He is

23   physically -- he's feeling the effects of -- the consequences

24   of his actions.  And he is afraid as a very young man to be

25   facing a federal drug conviction and a federal possible prison

```
                        Proceedings                      12
```

1   sentence.

2           He has had a stress reaction at home, having

3   fainting events, that doctors think are related to stress.  He

4   has lost a great deal of weight.  He has had difficulty

5   sleeping.

6           He has been deterred.  And none of the other more

7   general goals of sentencing, general deterrence, just

8   punishment, promoting respect for the law require prison time.

9   And I think that the comparable sentences from other people

10  like Bayron show that many judges in this courthouse in many

11  circumstances have found that.

12          And Bayron will have three years of supervised

13  release even without a jail time.  That is punishment for him.

14  That will be a significant restriction on his liberty and it

15  will also come with it obviously the possible -- a possible

16  jail term if he does anything he is not supposed to do.

17          So when looking at Bayron's characteristics, I think

18  that the most -- one of strongest ones Your Honor should

19  consider and the biggest ones in sentencing is his youth.

20          We all know that 22 years old make bad decisions,

21  that their brains haven't fully developed to access risks and

22  consequences, but that they can grow and change.  And Bayron

23  has shown that he is already doing that.  He has gotten a

24  steady job.  He works from 2:00 to 10:00 o'clock, five days a

25  week.

Proceedings                                          13

1       He stopped smoking marijuana, which is what he did

2   before his arrest.

3       And most importantly, he has become an active and

4   involved father to his young son who is seven months old.

5       Bayron didn't have a dad.  His father was

6   incarcerated before he was even born.  Bayron barely knows

7   him.  He doesn't know any details about his father's life.  He

8   desperately does not want to start a cycle where that happens

9   to his young son.

10      So I'm asking the Court to send Bayron back to his

11  son, back to take care of his son right now in the hospital,

12  but hopefully soon back at home, to be able to be the dad that

13  he never had, to stop this fourth disaster in his young life

14  from defining the life for his young family, to give him the

15  opportunity to show that he has put those disasters behind

16  him, those that were completely out of his control and the one

17  that was his fault, to let him show that he can learn from his

18  mistake and mature.

19      So I'm asking Your Honor to sentence him to time

20  served.

21      THE COURT:  Okay.  Thank you.

22      Does the Government wish to respond at all?

23      MS. BOWMAN:  No, Your Honor.

24      THE COURT:  Okay.  Did Mr. Garcia wish to address

25  this Court?

```
                    Proceedings                    14
```

1    MS. GLASHAUSSER:  Yes, Your Honor.  He has prepared

2  something to say to the Court.

3    THE COURT:  Okay.  Can you ask him to stand where

4  you were standing at the podium.

5    THE DEFENDANT:  Good afternoon.

6    Thank God for another day of life.  And I apologize

7  for this crime.  I have changed my life completely.

8    I am focused in working and getting my family ahead

9  in life.

10    In October, my son Jayl was born.  He is seven

11  months old now.  Now that I have become a father, I have a

12  different vision and a different lifestyle.  I hope I will get

13  the chance to continue to be a good father and to continue

14  working.

15    Thank you for the opportunity to speak and have a

16  good day.

17    THE COURT:  Thank you, Mr. Garcia.

18    Ms. Glashausser, in your submission at page 2, you

19  make a request that the Court sentence Mr. Garcia to a

20  sentence of time served and supervised release or probation,

21  and I'm curious in your mind in terms of the distinction

22  between the two requests.  Today you said just the time served

23  and the supervised release.  You left out the probation

24  aspect.

25    Why would the Court pursue a time served on

```
                       Proceedings                    15
```

1  supervised release as a sentence versus probation in this

2  particular case?

3          MS. GLASHAUSSER:  I'm not sure that the distinction

4  is that great, Your Honor, actually.  So if those are the two

5  options Your Honor is considering, I'm not going to argue you

6  out of either one.

7          I think it is more common in these -- it is just

8  more common in our court to have time served and supervised

9  release.  I think as a practical matter --

10          THE COURT:  In this case, he was arrested and

11  processed but released the same day or am I mistaken?

12          MS. GLASHAUSSER:  That's right.  And that's also

13  pretty common in these cases.  So the time served is one day

14  and then supervised release.

15          I think in terms of what he would need to do and the

16  restriction on his liberty, it would be the same.

17          THE COURT:  It's the same.  But the consequence of

18  failing to abide by the conditions, potentially, as a

19  practical matter, we know, but just in terms of at least what

20  is technically available as consequences is different on time

21  served versus probation.

22          MS. GLASHAUSSER:  That's true, Your Honor, which is

23  why I usually ask for time served and supervised release.

24  Although, in this case, Your Honor would actually be free to

25  give fewer years of probation than supervised release.  So

1    that would be a great option, Your Honor.

2            THE COURT:  Okay.  I'm assuming the Government has

3    nothing to add in that regard?

4            MS. BOWMAN:  No, Your Honor.

5            THE COURT:  Okay.  So, first of all, let me say

6    thank you to Mr. Garcia for his statement.  Thank you to Ms.

7    Glashausser for her advocacy on your behalf.

8            I have read the submissions in this particular case.

9    And there are times, Ms. Glashausser, when you and I have had

10   much to disagree about.  This is not one of those cases on a

11   number of levels and I want to identify them.

12           First, certainly the quantity of drugs at issue in

13   this case and the seriousness of this crime can't be

14   diminished.  However, it is also the case that I believe quite

15   firmly that the guidelines range in this case doesn't really

16   speak to the role that Mr. Garcia had in the case and that the

17   guideline range in this case is driven in large measure by the

18   amount of drugs at issue.

19           Given his role, as I understand it, he had no

20   control over the amount of drugs at issue in this case.  There

21   can be no question that Mr. Garcia was quite young at the time

22   that this offense took place.  I think that that is an

23   important factor that the Court must consider in kind of

24   assessing who the individual before me is.

25           And while it is a consideration, there has been some

Proceedings                                              17

1   time that has happened since these events have transpired, so

2   I am able to see how this young man is growing into an older,

3   a more responsible man.  I'm.

4           Sorry to hear your son is in the hospital.  As a

5   parent myself, I do know that that is probably one of the most

6   frightening experiences you could have, the concern over the

7   health and welfare of your child.

8           And it is unfortunate the events that has brought us

9   here today have taken you away from your son when you wanted

10  to be his side.

11          And so I have to balance a number of considerations.

12  And at the end of the day, I don't believe an incarceratory

13  sentence in this case furthers the aims of sentencing.  I

14  don't believe that it is going to assist in what I believe has

15  already begun, which is a path towards rehabilitation on the

16  part of Mr. Garcia.

17          I am impressed with what I have seen here.  Has the

18  two years been perfect?  No.  I get that.

19          But has there been improvement?

20          You were using marijuana.  You stopped using

21  marijuana.

22          You have a job that you report to on a regular

23  basis.

24          These are all indications that you are already

25  growing and coming into the young man that I have no doubt

Proceedings                                          18

1   that you want to be, that you are capable of being.  And,

2   indeed, it seems to me that this is anomalous.  There is not a

3   history of Mr. Garcia's acting in a manner inconsistent with

4   the law.

5           This case doesn't define you, Mr. Garcia.  The

6   question that you will have to ask yourself going forward is

7   what does.  You are a father, right.  You have a son.  Who are

8   you going to become?  You will let me know over time.

9           So what I intend to do in this case is sentence Mr.

10  Garcia to a term of one year probation.

11          All right.  Now, I have to inform you, Mr. Garcia,

12  that although I'm not sentencing you to a term in prison, it

13  is my expectation that you will not take this opportunity for

14  granted.  Probation comes with it great responsibility.

15          What I am going to do now is discuss with you the

16  conditions of probation to which you will be expected to

17  adhere.  You will be held to a high standard while you are on

18  probation.  And your failure to abide by the terms of your

19  probation can have serious consequences, including the

20  revocation of your probation and imprisonment.

21          While on probation, sir, you shall be subject to the

22  following mandatory condition:

23          You shall not commit another federal, state, or

24  local offense.

25          You shall not unlawfully possess a controlled

Proceedings                                    19

1   substance.

2          You shall refrain from any unlawful use of a

3   controlled substance.

4          You shall pay any assessment imposed in accordance

5   with 18, U.S.C., Section 3013.

6          You will notify the Court of any material change in

7   your economic circumstances that might affect your ability to

8   pay a restitution, fines or special assessments.  And if the

9   Court imposes a fine, you shall pay any fine and adhere to any

10  court-established payment schedule.

11         In addition, you must abide by the following

12  standard conditions:  You shall report to the probation office

13  in the federal judicial district where you are authorized to

14  reside within 72 hours of the time you are sentenced unless

15  the probation officer instructs you to report to a different

16  probation office or within a different timeframe.

17         After initially reporting to the probation office,

18  you will receive instructions from the Court or the probation

19  officer about how and when you shall report to the probation

20  officer, and you shall report to the probation officer as

21  instructed.

22         You shall not knowingly leave the federal judicial

23  district where you are authorized to reside without first

24  getting permission from the Court or the probation officer.

25         You shall answer truthfully any questions asked of

1    you by your probation officer.

2              You shall live in a place approved by your probation

3    officer.  And if your plans change with respect to where you

4    live or anything about your living arrangements, including the

5    people you live with, you shall notify your probation officer

6    at least 10 days before the change.  If notifying the

7    probation officer in advance is not possible due to

8    unanticipated circumstances, you shall notify the probation

9    officer within 72 hours of becoming aware of the change or

10   expected change.

11             You shall allow the probation officer to visit you

12   at any time at your home or elsewhere.  And you shall permit

13   the probation officer to take any items prohibited by the

14   conditions of your supervision that he or she observes in

15   plain view.

16             You shall work full-time, that is at least 30 hours

17   a week, at a lawful type of employment unless the probation

18   officer excuses you from doing so.  If you do not have

19   full-time employment, you shall try and find full-time

20   employment unless the probation officer excuses you from doing

21   so.

22             If your plans change with respect to where you work

23   or anything about your work, and that includes your position

24   or job responsibilities, you shall notify the probation

25   officer at least 10 days before the change.  If notifying the

1    probation officer at least 10 days in advance is not possible

2    due to unanticipated circumstances, you shall notify the

3    probation officer within 72 hours of becoming aware of the

4    change or expected change.

5           You shall not communicate or interact with someone

6    you know is engaged in criminal activity.  If you know someone

7    has been convicted of a felony, you shall not knowingly

8    interact with that person without first getting permission by

9    the probation officer.

10          If you are arrested or questioned by a law

11   enforcement officer, you shall notify the probation officer

12   within 72 hours.

13          You shall not own possess or have access to a

14   firearm, ammunition, destructive device or dangerous weapon,

15   that is anything that was designed or modified for the

16   specific purpose of causing bodily injury or death to another

17   person, such as nunchucks or a TASER.

18          You shall not act or make any agreement with any law

19   enforcement agency to act as a confidential human source or

20   informant without first getting permission from the Court.

21          If the probation officer determines, based on your

22   criminal record, personal history and characteristics, as well

23   as the nature and circumstances of your offense, that you pose

24   a risk to another person, including an organization, the

25   probation officer, with prior approval of the Court, may

Proceedings                                    22

1   require you to notify the person about the risk, and you shall

2   comply with that instruction.

3          The probation officer may contact the person and

4   confirm that you have notified the person about the risk.

5          You shall follow the instructions of the probation

6   officer related to the conditions of your supervision.

7          All right.  I'm going to order that Mr. Garcia pay a

8   mandatory special assessment in the amount of $100.  I,

9   however, decline to impose a fine as it appears that Mr.

10  Garcia is unable to pay one.

11         I want to note that while I don't believe that a

12  period of incarceration was warranted in this case based on

13  the facts of this case and what I have learned about Mr.

14  Garcia, even if I had, I just have to state for the record

15  that in fashioning an appropriate incarceratory sentence here

16  would have proven difficult given the conditions that persist

17  at MDC.

18         This wouldn't have been a case in the normal case of

19  this sort, the type of courier case where the Court would

20  impose a significant sentence.  The Court would likely have

21  imposed a sentence which would have made it possible that the

22  entire period of incarceration would have been served at MDC

23  and that would have given me great pause.  I need to say this

24  on the record as often as possible until the Government does

25  what it needs to do to ensure that the conditions at MDC

1    change.  It is affecting the way in which judges are imposing

2    sentences.

3            It is, in some cases, requiring us, demanding that

4    we sentence people for less time in jail than we otherwise

5    would because the Government has failed to ensure that the

6    conditions at MDC are improved and are improved at a level

7    commensurate with what I believe is this great nation.

8            So I needed to say that.

9            Obviously, Mr. Garcia, your sentence was not based

10   on the statements that I just made.  Your sentence was based

11   on what I see about you and the facts of this case and the

12   work that you have done to rehabilitate yourself.  I want you

13   to know that.

14           All right.  I have to apprise Mr. Garcia of his

15   right to appeal his sentence.

16           Sir, you have a statutory right to appeal your

17   sentence under certain circumstances, particularly if you

18   believe that your sentence is contrary to law.

19           However, I will note that pursuant to paragraph 4 of

20   your agreement with the Government you agreed not to file an

21   appeal or otherwise challenge your conviction or sentence if

22   the Court imposed a term of imprisonment at or below 63

23   months, which I did today.

24           Now, any Notice of Appeal must be filed within 14

25   days of the entry judgment or within 14 days of the filing of

Proceedings                                             24

1   a Notice of Appeal by the Government.

2            If requested, the clerk will prepare and file a

3   Notice of Appeal on your behalf.  And if you cannot afford to

4   pay the cost of an appeal or for appellate counsel, you have

5   the right to apply for leave to appeal in forma pauperis,

6   which means that you can apply to have the Court waive the

7   filing feel.  And on appeal, you must also apply for

8   court-appointed counsel.

9            Does the Government intend to make a motion with

10  respect to the remaining counts?

11           MS. BOWMAN:  Yes, Your Honor.  The Government would

12  move to dismiss the open counts.

13           THE COURT:  All right.  And the open counts would

14  include Count One and also --

15           MS. BOWMAN:  He pled to a lesser included.  So to

16  the extent Count Two remains open.

17           THE COURT:  Yes.  And to the extent Count Two

18  remains open.  So Count One and whatever remains of Count Two

19  are dismissed.

20           Is there anything else?

21           MS. BOWMAN:  Not from the Government, Your Honor.

22           MS. GLASHAUSSER:  No, Your Honor.  Thank you.

23           THE COURT:  Mr. Garcia, I have every expectation

24  that you are going to abide by the conditions of your

25  probation, which means I will not have the opportunity to have

```
                        Proceedings                        25
```

1   you before me again.  So let me take this opportunity to wish

2   you luck.

3               THE DEFENDANT:  Thank you.

4               THE COURT:  You're welcome.  Have a good one.

5               MS. GLASHAUSSER:  Thank you, Your Honor.

6               THE COURTROOM DEPUTY:  All rise.

7               (Matter adjourned.)

8                       *    *    *    *    *

9   I certify that the foregoing is a correct transcript from the
    record of the proceedings in the above-entitled matter.

10

11  /s/ Michele Lucchese                 April 10, 2024

12  _____          _____
    Michele Lucchese                     DATE

13

14

15

16

17

18

19

20

21

22

23

24

25