

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 16, 2024

**By ECF**
The Honorable Jennifer L. Rochon
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Christen Chen*, 24 Cr. 77 (JLR)

Dear Judge Rochon:

      The Government respectfully submits this letter in advance of sentencing in the above captioned case, which is scheduled for October 23, 2024. On May 17, 2024, Christen Chen, the defendant, pleaded guilty to two counts: engaging in the business of firearms dealing without a license, and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 371 and 922(a)(1)(A), in connection with his participation in a scheme to traffic over a dozen firearms from Georgia to New York.

      As explained below, the Government submits that a sentence at the low-end of the Guidelines sentence of 108 months' imprisonment followed by three years of supervised release would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing. Defense counsel has requested a significantly below-guidelines sentence of 36 months imprisonment.[1]

      **I.**    **Factual Background**

      From in or around September 2023 through at least January 2024, Christen Chen, a/k/a "Nauti," the defendant, as well as Shaqoya Hall and Zachary Hampton, a/k/a "J" (the "Defendants") participated in a conspiracy to traffic firearms from Georgia to New York. Over the course of the conspiracy, the Defendants discussed the sale of at least forty firearms and actually sold thirteen firearms to a confidential informant (the "CI"). Chen was the most culpable member of the scheme having been introduced to the CI as a "gun plug" capable of supplying firearms upon request. Over the course of the scheme, Chen participated in every facet of the scheme, to include, among other things, communicating directly with the CI via text message,

---

[1] As noted by defense counsel, the parties have agreed to an amended plea agreement which allows either party to "seek a sentence outside the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a)." Accordingly, we jointly request that paragraph 7(c)(iii) be struck from the Presentence Report.

sending the CI photographs of dozens of firearms with offers to sell, participating directly in sales, and traveling between Georgia and New York.

This investigation began after law enforcement received a tip from a confidential informant (the "CI") about Hampton's ability to acquire guns through one of Hampton's acquaintances, later identified as Chen. In or about September 2023, Hampton introduced the CI to Chen, who shortly thereafter began communicating directly with the CI about the sale of firearms. Chen communicated primarily by text message and frequently sent photographs of particular guns to the CI, along with offers to sell the guns including with pricing information. The guns included those with extended magazines inserted, an AR style pistol, and a semi-automatic rifle. For example:

- On or about November 20, 2023, while Chen was in Charlotte, North Carolina, Chen sent the below photograph to the CI and told the CI, in sum and substance, that he had an AR style pistol for sale for "1300" and offered to sell the firearm with, in sum and substance, five magazines and a "muzzle."

- On or about December 29, 2023, Chen sent the CI several photographs of firearms available for sale including eight handguns and a semiautomatic rifle. Photographs of one of the handguns (with an extended magazine inserted) and the semiautomatic rifle are included below.





Hampton also communicated with the CI directly and, in so doing, referenced his collaboration with Hall, whom he had met through Chen. For example, on one occasion, Hampton sent a photo of four firearms with corresponding prices and told the CI, in sum and substance, to tell Hampton what the CI wanted to purchase because he was trying to have Hall travel to New York as soon as possible. On another occasion, on or about October 26, 2023, Hall sent Hampton the below photograph of six firearms which Hampton then sent to the CI. (PSR ¶ 30). Four of the six firearms depicted below were sold to the CI on or about October 30, 2023.



Ultimately, as described in the complaint, the Defendants sold and attempted to sell 13 firearms to the CI. Over the course of the scheme, the Defendants traveled between Georgia and New York City. Specifically:

- In or about summer 2023, Hall and Chen drove from Georgia to New York, while transporting four firearms, none of which were sold to the CI.

- In or about fall 2023, Hall traveled via passenger bus from Georgia to New York, while transporting five firearms.

- On or about October 16, 2023, at approximately 12:15 p.m., the CI met Hampton in the vicinity of Hampton's residence in Staten Island. The CI and Hampton then walked towards a bodega located on Castleton Avenue in Staten Island where they met up with Chen and Hall. Hampton then told the CI and Chen, in sum and substance, to go into the Bodega to complete the sale. At Hampton's direction, the CI, Chen, Hall, and Hampton entered the Bodega where Chen produced a firearm which he previously had concealed on his person. Chen showed the firearm to the CI. And in response, the CI handed Chen approximately $1,000. Chen gave the firearm to the CI and proceeded to count the money while Hall handed the CI at least five rounds of 9mm ammunition.

- On or about October 30, 2023, at approximately 1:28 p.m., the CI met Chen and Hall in Staten Island to purchase the firearms. Chen handed the CI a black bag, which the CI understood to contain the firearms. The CI then handed Chen a stack

of cash totaling approximately $5,000. Chen then provided Hall with a portion of the cash which had been provided by the CI. After the sale, the CI transferred the black bag to law enforcement officers. Law enforcement officers recovered from the bag four firearms wrapped in a white t-shirt. A photograph of the four seized firearms is copied below.



- On January 26, 2024, Hall traveled from Georgia to New York via passenger bus, while transporting six firearms.

- Between on or about January 26, 2024 and January 28, 2024, Hall acquired two firearms from a supplier in New York City.

- On or about January 29, 2024, Hampton and the CI exchanged text messages in which they negotiated the CI's purchase of eight firearms for approximately $13,500. On or about January 30, 2024, the CI and Hampton exchanged text messages in which they discussed the logistics of the contemplated sale of eight firearms and agreed, in sum and substance, to meet at a hotel located in New York, New York. On or about January 30, 2024, at approximately 1:20 p.m., law enforcement officers conducting surveillance at the Hotel observed Hampton standing outside the Hotel while Hall stood in the lobby of the Hotel carrying two backpacks. Upon identifying Hampton and Hall, law enforcement officers approached Hampton and Hall and placed them under arrest and seized the backpacks in Hall's possession. One of the backpacks was found to contain a total of eight firearms wrapped in t-shirts. A photograph of the eight seized firearm is copied below.



Before and during the charged conspiracy, Chen held himself out as a gun supplier in *hundreds* of text messages, a few examples of which—in addition to the conversations with the CI—are included below:

- On or about July 3, 2020, Chen sent a user saved as "Chewy" the below photograph depicting, among other things, two firearms, nine standard magazines, an extended magazine, a holster, and hundreds of rounds of ammunition. Chewy, acknowledging that Chen had offered the items for sale, responded "need it.



- On or about July 19, 2020, Chen informed "Chewy" that he (Chen) had just arrived in Atlanta and was about to go see a gun supplier, stating, "boutta go see bout this Glock." Chen later followed up to provide pictures of the Glock to Chewy and informed Chewy

that the seller wanted "7" because it was "custom." Chewy then told Chen that he (Chewy) would send a CashApp payment. Months later in September 2020, Chen and Chewy discussed the sale of another firearm. It continued, on or about September 13, 2020, Chen sent a series of photos of firearms to Chewy and told Chewy that the supplier "want 7" but that Chen wanted to put "his tax" on it and charge $900.

- On or about February 27, 2020, Chen chatted with a user saved as "Reco" whom he offered to sell Percocet pills ("How many perks you wanted [sic]"). Reco and Chen continued to discuss sales of marijuana and pills for several months. On or about July 20, 2020, Chen sent the below (left) photograph and told Reco, in sum and substance, that the firearm was available for $700. Four days later, Chen sent Reco the below (right) photograph and told Reco that he would bring the firearm to meet with Reco. The next day, on or about June 25, 2020, Reco asked Chen if he could "get it in [his] name." Chen responded yes and reminded Reco that the "40" was still for sale. Reco expressed hesitation regarding the price and engaged in negotiations for a holster. Reco and Chen then discussed the sale of marijuana. Reco and Chen continued their conversations through late 2021. On or about September 10, 2021, in discussing the quality of a particular firearm, Chen boasted to Reco, "I'm Really "That" plug In The City…"

 

- On or about June 22, 2023, Chen traveled to New York by bus. Upon arriving, he met up with an individual saved as "Dellz" whom he asked if he should get the "rounds for OG" and then explained that "the [] bullets is in the zipper part [of Chen's bag] under clothes and shit." Dellz and Chen then discussed the pricing of black-market firearms which, they lamented, had been distorted by the pandemic.
- On or about June 15, 2023, Chen chatted with a broker saved as "himoth60s," who told Chen that he had available a ghost gun. Chen responded that he "need that." Chen then told "himoth60s" that he wanted a Keltec brand gun. Later, on or about June 24, 2023, Chen told "himoth60s" that he wants "pistols." Then, on or about July 12, 2023, Chen

- communicated that he wanted a "switch," which is a reference to a machinegun conversion device.
- On one occasion Chen sent the below photograph to a customer with the following message: "Here lay the 9mm package of your dreams. Loaded with a 5.5 inch complete Foxtrot Mike AR9, Glock 19x, and 2 Glock 26 models one Gen 3 and the other Gen 4. All are in A+ condition. The 19x and Gen 4 26 will come with box's and all that good stuff. The Gen 3 26 has night sights. 15 magazines will be included between all 4 firearms. There will be 4 30+ round mags, 2 15 rounders, 2 19 round mags, 4 10 round mags, 2 12 round mags, and 1 17 round mag. This will also come with 4 holsters and the light and scope. There are also numerous Glock tools in the case. (3 of the 30+ round mags are not pictured but will be included) $2700."



On many occasions, including the below, Chen sent photos of firearms to potential customers with the serial numbers visible, allowing law enforcement to confirm that the firearms were real. The firearms he offered for sale included those with extended magazines and were sometimes offered with ammunition.



*Handgun with extended magazine inserted. At least two other firearms are visible in the background.*



*Three firearms with ammunition scattered in the background*

## II. The Plea and Guidelines Calculation

On July 8, 2024, the defendant pleaded guilty to Counts One and Two of the Indictment. In the plea agreement, the parties stipulated that the defendant's base offense level was 30 because (i) the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine and (ii) the defendant was a prohibited person at the time of the offense, having been previously convicted of a felony. The parties stipulated to enhancements for (i) the number of firearms involved in the offense, (ii) the sale of a stolen firearm, and (iii) the transfer of firearms to others who would dispose of the firearms unlawfully. After a reduction for his acceptance of responsibility, the defendant's offense level was 30. At criminal history category II, the calculated guidelines range would have been 108 to 135 months' imprisonment. However, the statutory maximum sentence on Counts One and Two is 120 months. Therefore, the Stipulated Guidelines Range is 108 to 120 months' imprisonment.

In calculating the Adjusted Guidelines Range, the Probation Department determined that the defendant has three criminal history points based on their identification of a two-year term of imprisonment imposed in connection with a violation of probation which the parties were not aware. Accordingly, the Probation Department placed the defendant in criminal history category III and determined that the Adjusted Guidelines Sentence was the statutory maximum 120 months.

In his sentencing submission, the defendant has asked the Court for a significantly below-Guidelines sentence of 36 months imprisonment. The Probation Department has recommended an 84-month term of imprisonment.

As the Government explained at the sentencing of Chen's co-defendant Hall, Chen is the most culpable member of the scheme. On August 27, 2024, this Court sentenced Hall to a 36-month term of imprisonment after she entered a plea of guilty to Count One of the Indictment. The third defendant in this case, Zachary Hampton, is due to be sentenced December 4, 2024, having entered a plea to Count One of the Indictment.

### III.   Discussion

#### A.  A Guidelines Sentence of Imprisonment is Necessary and Appropriate

The Government respectfully submits that the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) weigh in favor of a sentence at the low end of the Stipulated Guidelines Range, to be followed by three years of supervised release. The factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others, to protect the public from further crimes of the defendant, and to promote respect for the law. 18 U.S.C. § 3553(a)(2)(A)-(C).

For years, the defendant sold guns unlawfully, without regard for the impact on his community and with full knowledge of the illegality of his conduct. His attempts to sell guns by text message were frequently interwoven with attempts to sell pills and marijuana and were motivated purely by a desire for profit. His decision to traffic guns put his community in peril in a very real and serious way. As the defendant acknowledges, individuals like the defendant who illegally traffic in firearms are the driving force behind an epidemic of gun violence in New York City. These individuals act with a complete disregard for the danger they create and the lives they put at risk. There are no gun manufacturers in New York City. Guns flow into the city via traffickers, traveling by car, train, plane, and bus from outside the state, often through the "Iron Pipeline" or the "New York Pipeline"[2] — the very pipeline that the defendant traveled along by bus while transporting guns. A combination of a general lack of access to guns and strict local gun laws, creates a black market that allows gun traffickers to sell guns to make quick money.

The New York Attorney General estimates that 76% of trafficked guns come into New York from seven states including  — as in the case of the defendant —Georgia.[3] These guns fuel violence in the city. Although most of the firearms in this case were sold to a CI, the Defendants were oblivious to the fact that they were trafficking firearms to law enforcement. Instead, they believed they were unlawfully supplying firearms to individuals who would possess them in the community, without regard for anyone's safety or wellbeing. Aside from firearms sold to the CI, Hall and Chen also transported at least four firearms to New York in the summer of 2023, prior to the initiation of this investigation. In all likelihood, at least the four firearms that remain unaccounted for have been injected into the community, potentially contributing to violence for

---

[2] www.documentcloud.org/documents/21185516-nyc-mayors-blueprint-to-end-gun-violence.

[3] https://targettrafficking.ag.ny.gov/. *See also* Most Guns Used to Commit Crimes in New York Were Bought in Other States, Report Finds – NBC New York

years to come. Chen is also responsible for the sale of an unknown number of firearms, which are likley currently circulating in the community with the potential for use in fatal violence.

As to this defendant, there is a particular need for specific deterrence. As demonstrated by the above, Chen's involvement with gun trafficking did not begin with this case. In fact, it had been going on for years. The number of guns that the defendant offered for sale over the course of his career as a gun dealer is stunning. In conversations with the CI *alone*, Chen sent photographs of thirty-seven firearms in the course of their discussions about potential sales. Chen's phone contains text messages with photos of dozens and dozens of firearms—some of which are described above—the majority of which were offered for sale. His sales and attempted sales included some of the most dangerous firearms and firearms accessories available including ghost guns, stolen guns, and guns equipped with extended magazines. Far from "overstating" his conduct, the plea agreement and Stipulated Guidelines Range in this case capture exactly the nature of the defendant's wrongdoing.

Chen's attempts to minimize the egregious nature of his conduct with reference to the "tolerant" gun cultures of states like North Carolina and Georgia misses the point entirely. Chen's unlicensed firearms dealing is *illegal in every state*. Nowhere in the United States is it lawful to offer to sell guns to the same customers to whom, moments before, you sold controlled substances. Nowhere in the United States is it legal to sell stolen guns or to offer to transport firearms between states for resale. Nowhere in the United States is it legal to hold yourself out as a "gun plug" where you are not licensed to do so. And with good reason. Regulations surrounding the licensing of firearms dealers and governing firearms sales are aimed at ensuring that firearms do not fall into the hands of criminals. The defendant knew full well what he was doing as he acknowledged through his plea which included an enhancement for the transfer of firearms to others who would dispose of the firearms unlawfully. Chen was proud of his conduct when he boasted, "I'm Really "That" plug In The City…" While his remorse may be sincere now, so too is the harm he has caused.

In support of his position that a 36-month term of imprisonment would serve the sentencing aim of avoiding unwarranted disparities, the defendant cites several cases from this District which he asserts are analogous to his own. But the cited cases—at least some of which involved defendants incarcerated during the height of the COVID-19 pandemic—dealt with the sale of far fewer firearms and distinguishable defendants. *See United States v. Morgan*, 21 Cr. 566 (PGG) (the defendant sold four firearms, was facing deportation, and was incarcerated during the height of the COVID-19 pandemic); *United States v. Maisonet*, 20 Cr. 118 (JSR) (defendant sold five firearms and was incarcerated during the height of the COVID-19 pandemic); *United States v. Steven Perez*, 22 Cr. 644 (JSR) (defendant was facing separate state prosecution and was not convicted of distribution/sale of firearms); *United States v. McCray*, 18 Cr. 34 (AT) (case transferred from EDPA pursuant to Rule 20; defendant transported one firearm and had engaged in significant rehabilitative efforts during a six year period of release prior to sentencing); *United States v. Lee*, 15 Cr. 142 (RWS) (defendants responsible for the sale of three total firearms).

The sentence sought here by the Government does not create unwarranted disparities but is instead aligned with other cases involving similar levels of trafficking. *See United States v. Wilson, et al*, 21 Cr. 249 (SHS) (120-month terms of imprisonment for the top two defendants who

were held accountable for the collective transportation and sale of approximately 89 firearms); *United States v. Jordan*, 22 Cr. 473 (LTS) (twenty-year old defendant without criminal history sentenced to 84 months' imprisonment for trafficking of 50 firearms).

The defendant's criminal conduct cannot be taken lightly. At a time when gun violence is so prevalent, the need for general deterrence is particularly striking. *See United States v. Cavera*, 550 F.3d 180 (2d. Cir. 2008) (considering the district court's decision to consider New York market conditions in order to accomplish the goal of general deterrence in a gun trafficking case and holding no abuse of discretion). A Guidelines sentence of incarceration would send a message to the defendant and others like him that firearms trafficking will not be tolerated.

### IV.  Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Stipulated Guidelines Range, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: *[signature]*
Ashley C. Nicolas
Assistant United States Attorney
(212) 637-2467

cc:    Hannah McCrea, Esq. (by ECF)